UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Crim. No. 5-20-B-W |
| | ) |
| JOSHUA DELMONACO, | ) |
| | ) |
| Defendant | ) |

**RECOMMENDED DECISION**

Joshua Delmonaco, charged with importation of controlled substances in violation of 21 U.S.C. § 952(a), has filed a Motion to Suppress (Docket No. 15) and a Supplemental Motion to Suppress (Docket No. 25.)  I held an evidentiary hearing on the motions on August 22, 2005.  Based upon the evidence presented at that hearing, the stipulations of the parties, and the information contained within the stipulated affidavits that are part of the record, I now recommend that the court adopt the following proposed findings of fact and **DENY** the motions.

**PROPOSED FINDINGS OF FACT**

*Stipulated Facts Regarding The Border Crossing and Detention*

On March 3, 2005, at approximately 8:54 p.m., a dark blue Ford Crown Victoria with Maine license plate 6267 was referred for a secondary inspection at the Milltown Port of Entry ("POE").  The sole occupant of the vehicle was identified as Joshua Delmonaco.  A check with Canada Customs revealed that the vehicle entered Canada at 8:43 p.m. that day and thus had been in Canada for approximately 11 minutes.  At approximately 9:10 p.m., Acting Supervisor Kevin McIntyre of Customs and Border

Protection ("CBP") sent CBP Officers Wayne Hoyt and Eric Corey to the Milltown POE in response to a request from the CBP officer who was conducting the secondary inspection of the Crown Victoria at the Milltown POE. Upon arrival at the Milltown POE, Hoyt and Corey were directed to a Joshua Delmonaco, a United States citizen. A computer generated "lane check" on the vehicle revealed numerous border crossings between January 1, 2005, and March 3, 2005, which struck Officer Corey as odd because Delmonaco appeared to reside in Brewer, Maine, which is remote from the border. Delmonaco told Hoyt and Corey that he had left Bangor, Maine, at approximately 5:30 p.m. and drove to Calais where he had family and friends and that he was staying with a man named Steven Gibson. Delmonaco also told Hoyt and Corey that he entered Canada at Ferry Point Bridge at 8:45 p.m. to drop off a gift to a family friend who resides in Milltown, New Brunswick. Delmonaco stated that no one was at home, so he left the gift on the porch and drove back to the U.S. crossing at Milltown, Maine, around 8:55 p.m. Delmonaco declared nothing. A detailed vehicle search was conducted by Officers Corey, Hartin and Hoyt and nothing was found. At approximately 10:25 p.m., Officer Corey conducted a pat-down search that was authorized by Acting Supervisor McIntyre. According to Corey and Officer Hoyt, Delmonaco was shaking during the search, did not make eye contact with them and there appeared to be a needle mark on Delmonaco's left arm. During the pat-down procedure Officer Corey noted that Delmonaco clinched his buttocks tight when that area was being patted-down. At approximately this same time, another CBP Officer noted that Steven Gibson was parked at the turnout just south of the Milltown POE. When the officers looked in his direction, he departed the area. Some

time later, the van was again observed south of the port and, like before, it departed when the officers took note of it.

Historically, Customs and Border Protection has received a large volume of intelligence regarding prescription drug smuggling at the Milltown POE and has intercepted multiple attempts to smuggle drugs through both the Milltown POE and the primary, Route 1, POE in Calais. Many of these smuggling attempts have involved vaginal and rectal concealment of pills. At approximately 11:05 p.m., Acting Supervisor McIntyre authorized a "personal" search of Delmonaco. Delmonaco was adamant that he would not remove his clothes or submit to the search. The procedure was explained to Delmonaco and the search commenced at approximately 11:10 p.m. Officers Hoyt and Corey conducted the exam. They instructed Delmonaco to remove his trousers and underwear and to bend over at the waist. Delmonaco was then instructed to use his hands to spread his buttocks. Delmonaco initially did not comply and then when he did he inserted the index finger of his right hand into his anus. Officer Hoyt instructed Delmonaco to remove his finger. Using a flashlight for illumination, Officer Hoyt observed that Delmonaco's rectum was dilated and contained what appeared to be an off-white foreign object. When Officer Hoyt announced his observation, Delmonaco became upset. Officer Hoyt then asked Officer Corey to take a look. Delmonaco initially would not spread his buttocks and, instead, squeezed them together in what appeared to Officers Hoyt and Corey to be an attempt to force the foreign object further into his rectum. When Officer Corey finally viewed the area, he stated that he could see only what appeared to be a grease-like substance and some white specks around Delmonaco's anus. Based on these observations, they prepared Delmonaco for transport to Calais Regional Hospital.

At approximately 12:25 a.m. on March 4, 2005, Delmonaco was placed on a portable toilet and restrained for a monitored bowel movement. Delmonaco asked Officer Hoyt what the record was for the length of time someone had sat on the toilet without defecating and then indicated that he was not going to defecate. Delmonaco remained handcuffed to the toilet with only brief interludes to allow him to stretch his legs and for the officers to check the toilet bowl. Officers Hoyt and Corey observed Delmonaco until approximately 6:30 a.m. on March 4, 2005, when they were relieved by CBP Officers Brennan and Rescsanski. At approximately 8:00 a.m., CBP Officer Lawrence Guillette relieved CBP Officer Brennan.

*Stipulation Concerning the Defendant's Medical Records*

Pursuant to the parties' stipulation, I admitted, under seal, sixteen pages of medical records (Def.'s Ex. 1) at the hearing concerning the treatment Delmonaco received at Calais Regional Hospital on March 4, 2005. Those records reveal that Delmonaco refused to sign the hospital's consent to treatment or release of information forms at 8:55 a.m. The records do contain Appendix E and Appendix F signed at 8:52 a.m. and 8:55 a.m., respectively, indicating that Delmonaco did sign a consent form for an x-ray and a consent form for a rectal examination.

In relevant part, the records reflect patient progress notes indicating the following:

1. 1:25 a.m. patient refusing medical treatment, doesn't want to be seen by a doctor, customs officer states that it is not required to have patient examined by doctor, but they do wish to have patient's vitals checked every hour;

2. Nursing staff checked on Delmonaco throughout the night and there was no change in condition; nursing staff was advised by customs that every forty-five minutes the allowed Delmonaco to get up from the commode and stretch his legs;

    3.  6:55 a.m. Delmonaco was still sitting on the commode, with handcuffs, and a customs and border protection officer was in the room with him;

    4.  At 9:50 a.m. nursing staff prepared Delmonaco for an anus scope by Dr. Brazier and at 9:56 he was taken, still in custody, for that procedure;

    5.  At 10:13 [a soup suds enema] was done and Delmonaco only tolerated 200 CC, with no results;

    6.  The procedure was repeated at 10:45 with 400 CC, still no results;

    7.  At 11:00 a.m. Delmonaco requested another enema;

    8.  At 11:20 another SSE with 700 CC of fluid was administered, producing a light brown watery stool, but no foreign substance; and

    9.  At 11:35 the doctor performed a digital examination and removed a clear package with blue/green tablets in it, shortly thereafter Delmonaco was discharged from the hospital and taken by law enforcement to another facility.

Dr. Laurie Churchill saw Delmonaco at 7:09 a.m. and her note reflects that at that time Delmonaco refused to consent to an examination or treatment by her. Dr. Churchill detected no medical emergency at that time. Dr. Barzier's note at 9:30 a.m. reflects that Delmonaco consented to an x-ray and that after the enema was unsuccessful he effectuated the digital removal. Finally, the radiologist's note, completed at 9:15 a.m. indicates inconclusive results vis-à-vis the presence of a foreign object within the rectum.

        *Additional Facts Developed Through Stipulated Affidavits and Testimony*

       On the night of March 3, 2005, Kevin McIntyre spoke to Senior Special Agent Philip Riherd who advised him that he had reliable information that two individuals would be returning from Canada that evening in a dark blue Crown Victoria and would be carrying drugs. Riherd did not tell McIntyre that the information was supplied by the Royal Canadian Mounted Police or that it was obtained as a result of a Canadian wiretap. After McIntyre received Riherd's telephone call, McIntyre received an anonymous call

5

from a male caller saying that a dark blue Crown Victoria would be coming across the border and that it would be carrying drugs into the United States. McIntyre then alerted the Milltown POE (the alternative border crossing in the Calais region) to this information. As already related, at approximately 9:00 p.m., Milltown notified McIntyre that they had a dark blue Crown Victoria stopped at the border and McIntyre dispatched Hoyt and Corey.

Since McIntyre was the acting supervisor that evening, it was his duty to weigh the circumstances and give the officers authorization to proceed with each more intrusive stage of this search. When Delmonaco was brought to secondary inspection McIntyre gave permission for a pat-down search and a thorough search of the vehicle. At about this time Senior Special Agent Riherd arrived on the scene and informed McIntyre that he could supply McIntyre with additional information that would justify taking the search to another level, but McIntyre had by that time already independently decided to take the steps necessary to authorize a "personal search" of Delmonaco. Riherd made no mention of a Canadian wiretap to McIntyre and never told McIntyre of his concern about protecting the secrecy of any ongoing Canadian operation.

According to McIntyre, he was independently advised by his supervisors prior to March 3 that anonymous calls with tips regarding drug smuggling should be treated seriously. The genesis of that alert appears to have come from a conversation Philip Riherd had with the Calais port director, Tim Ganell, in January or February 2005. Riherd contacted Ganell because he had spoken with a Sgt. Ferguson of the Royal Canadian Mounted Police and learned of an ongoing Canadian operation targeting, among others, a John Bridges in the St. John, N.C. area, a person of interest to both

American and Canadian law enforcement officers. Ferguson indicated that Canadian law enforcement might well gain information about drugs being brought into the United States. Ferguson and Riherd agreed to an arrangement whereby, if the Canadians gained such information, they would call the Calais POE anonymously and provide a "tip." This procedure was employed because neither side wanted the Canadian covert operation to be revealed. Riherd informed Ganell of the extremely sensitive nature of this information and it does not appear that Ganell told others of the operation.

One additional piece of the puzzle developed through McIntyre's testimony pertains to Steve Gibson and the observations that Hoyt and Corey made of him during their questioning of Delmonaco at the border. Steve Gibson was a name familiar to McIntyre through intelligence briefings he received regarding suspected drug smugglers at the Calais POE. That intelligence indicated that Gibson was a suspected drug abuser and smuggler. Thus, Delmonaco's statement that he resided with Gibson and Gibson's arrival at and sudden departure from the Milltown POE were of special significance.

Testimony also revealed that during the latter portion of Delmonaco's stay at the Calais Hospital, Laurent Guillette was the customs officer assigned to sit with Delmonaco. Officer Guillette arrived at the hospital at approximately 8:00 a.m.. Upon his arrival he struck up a conversation with Delmonaco when Delmonaco asked how long he would have to remain there. Guillette told Delmonaco that he did not know the answer to that question, but that usually in these cases the parties remained there until something happened. Guillette explained that the situation would ultimately resolve in one of four ways: (1) the evidence could be received through a natural process; (2) Delmonaco could consent to an x-ray and/or physical examination by a doctor; (3) a court

order to forcefully remove the foreign object could be obtained; or (4) the supervisory personnel could decide to simply release Delmonaco. About forty-five minutes after Guillette came on duty Delmonaco asked about how he could go about getting an x-ray performed. It was as a result of that query that Appendix E and F were executed giving permission for the x-ray and Dr. Brazier's rectal examination of Delmonaco. Guillette went with Delmonaco to the x-ray room and during that procedure Delmonaco expressed no reluctance about proceeding with what the medical personnel directed.

*The Canadian Wiretap Operation*

Neither Special Agent Phillip Riherd nor any other officer connected with the Calais POE requested, directed, or was involved with the Canadian wiretap operation, although the Canadian and American authorities in the St. Stephen/Calais area do routinely cooperate and share information and intelligence regarding illegal drug operations. Riherd himself never monitored any of the information gathered from the Canadian wiretap. The affidavits and applications used to obtain the Canadian wiretaps remain under seal at this time. Neither Special Agent Riherd nor any other American governmental officer to his knowledge has ever requested that the Court of Queen's Bench of New Brunswick unseal the affidavits connected with the wiretaps.

The record does contain (Government Exs. 2-5) four Canadian wiretap authorizations dated November 2, 2004, December 28, 2004, February 26, 2005, and March 11, 2005, respectively. All four wiretap authorizations were signed by a William K. Lebans, Q.C., an agent specially designated by the Deputy Solicitor General of Canada, were supported by the sealed affidavit and application of Joseph Guy Marco Vachon, a constable, and authorized by Chief Justice David Smith, a justice of the Court

of Queen's Bench of New Brunswick. Each authorization was valid for a period of not more than 60 days.

## DISCUSSION

Two standards apply to a border search of a person entering the country and there can be no dispute but that this case presents a classic border search. The first is a "no suspicion" standard which applies to routine border searches, and this sort of routine search may be conducted on a the basis of "subjective suspicion alone, or even on a random basis." United States v. Braks, 842 F.2d 509, 514 (1st Cir. 1988) (quoting United States v. Stornini, 443 F.2d 833, 835 (1st Cir.)). Where a search is non-routine (e.g., strip search), the court has applied the "reasonable suspicion" standard, requiring that the Government "demonstrate some objective, articulable facts that justify the intrusion as to the particular person and place searched." Id. at 513 (quoting United States v. Wardlaw, 576 F.2d 932, 934 (1st Cir. 1978)). The search here was clearly non-routine, and so must be justified on the "reasonable suspicion" standard.

In his initial motion to suppress, Delmonaco challenged the personal search at the border station based on an alleged lack of articulable suspicion. (Mot. to Suppress at 1, Docket No. 15.) Additionally, Delmonaco asserted that the twelve-hour detention he was subjected to was tantamount to an arrest without probable cause. (Id.) Finally, he argued that he did not "voluntarily" sign the consent forms that authorized medical personnel to conduct the x-ray and rectal examinations. (Id.) After the Court scheduled a hearing on the motion, but before the hearing was convened, Delmonaco filed a supplemental motion to suppress in which he asserted that the seizure and search of his person were unlawful because they arose from information obtained by Canadian authorities by means

9

of an unlawful wiretap and, by extension, the items obtained from his person were excludable fruit of a Fourth Amendment violation.  (Supplemental Mot. to Suppress at 3, Docket No. 25.)   In his memorandum of law, Delmonaco articulated this proposition as follows:

> The Defendant's argument starts from the proposition that his search at the border is the fruit of the Canadian wiretap. In the Defendant's view, he would not have been searched, certainly not beyond routine measures which revealed nothing, without the information derived from the Canadian wiretap.  Absent the wiretap information, the balance of the remaining information does not provide "reasonable suspicion" for the very intrusive measures used on the Defendant.  Conversely, however, if the Court finds no impediment to consideration by the border officers of the Canadian wiretap information, "reasonable suspicion", in fact, "probable cause" is readily established.

(Def.'s Second Supplemental Mem. Regarding Suppression at 3, Docket No. 39.) According to Delmonaco, he is entitled to sufficient discovery concerning the cause for the issuance of the Canadian wiretaps to be able to evaluate whether the Canadian investigation was a joint law enforcement venture and whether Canadian law enforcement personnel should be considered to have acted as agents of American law enforcement, thereby subjecting the Canadian wiretap authorization to Fourth Amendment scrutiny.  (Id. at 4; see also Supplemental Mot. to Suppress at 5-6.)

In United States v. Mitro, the Court of Appeals for the First Circuit held that "the fourth amendment and the exclusionary rule do not ordinarily apply to foreign searches and seizures."  880 F.2d 1480, 1482 (1st Cir. 1989) (citing United States v. Janis, 428 U.S. 433, 455 n.31 (1976)).  Two exceptions pertain for circumstances in which the "foreign police conduct shocks the judicial conscience, and where American agents participated in the foreign search, or the foreign officers acted as agents for their American counterparts."  Id. (quotation marks and citation omitted).  Neither exception

applies here. The facts are clear that Riherd had no more involvement with the Canadian wiretap than did Drug Enforcement Agent Joseph Coons in the Mitro case. In both this case and that one there was shared information. But in neither case were the Canadian officers acting as the agents of the American investigators and the American authorities had no involvement in the acquisition of the Canadian wiretap authorization.[1] Thus, I am satisfied that the investigation that underlies the "anonymous tip" in this case has none of the hallmarks of what Delmonaco loosely refers to as a law enforcement "joint venture" because American law enforcement officers did not participate in the wiretap and Canadian law enforcement officers did not serve as the agents of American law enforcement agencies when conducting the wiretap. Accordingly, there is no need for further inquiry regarding the "legality" of the Canadian wiretap pursuant to Mitro.

With this question decided, I turn to Delmonaco's initial contentions about the lack of reasonable suspicion, a *de facto* warrantless arrest without probable cause, and "involuntary consent." I note that these contentions were not supported in Delmonaco's memoranda of law and also that they appear to be conceded, at least to a degree, by Delmonaco's assertion that "if the Court finds no impediment to consideration by the border officers of the Canadian wiretap information, 'reasonable suspicion,' in fact, 'probable cause' is readily established." (Def.'s Second Supplemental Mem. Regarding Suppression at 3.) In any event, I am satisfied that there were ample articulable facts that supported the CBP Officers' non-routine, personal search of Delmonaco at the border. Supervisor McIntyre received the anonymous call that contraband drugs would be carried

---

[1] It appears abundantly clear that even if a joint venture did exist, the Canadian wiretap would not be reviewed under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, which authorizes the use of electronic surveillance. See United States v. Maturo, 982 F.2d 57, 60 (2d Cr. 1992) (holding that Title III does not apply outside the United States).

11

across the border in a vehicle of a specific make, model and color and a vehicle matching the description provided by the caller came to the Milltown POE that very evening. Additionally, the vehicle had spent a conspicuously short time in Canada and a suspected drug smuggler, Gibson, appeared inordinately interested in Delmonaco's re-entry into the United States. Moreover, Delmonaco responded to the pat-down in an extremely nervous and self-protective manner and provided at least one physical cue that he might be smuggling drugs in a body cavity when he clenched his buttocks during the pat-down. These initial facts and observations provided enough information to justify the personal search of Delmonaco and, once the suspicious object was detected and Delmonaco was observed trying to prevent any such detection, the continued detention and transfer to medical facilities for the following twelve-plus hours became justified based on probable cause. I conclude that this detention did not exceed constitutional norms because it was of relatively short duration in light of the circumstances presented. Courts have approved detention of suspected alimentary canal drug smugglers for up to at least 48 hours without seeking judicial approval. United States v. Adekunle, 2 F.3d 559, 562 n.15 (5th Cir. 1991) (collecting cases). I also conclude that Delmonaco has waived any contention that the nature of the physical restraints imposed upon Delmonaco (I have in mind here the shackling of Delmonaco to a commode) was unreasonable under the circumstances or required pre-authorization from a detached and neutral magistrate because no such argument has been presented. Finally, I consider the issue of whether Delmonaco's "consents" to the ex-ray and rectal exam were voluntary to be something of a red herring. Certainly there is no evidence that any unreasonable police procedures were used to obtain Delmonaco's signatures on the consent forms and the forms themselves indicate

12

that Delmonaco need not have consented to the procedures in question. Officer Guillette's recitation of the four alternatives available was an even-handed presentation of the state of affairs. Given the options available to Delmonaco, it appears that he wanted the matter resolved sooner rather than later. He independently broached the subject of signing the consent to the x-ray and signed it in the absence of any compulsion. Had he not signed it, the legal options available to the Government were to continue the monitored bowel movement protocol or obtain a court order.[2] The method of the ultimate extraction of the packet of pills by the physician pursuant to the signed consent did not violate the Fourth Amendment.

## CONCLUSION

Based on the foregoing I recommend that the court **DENY** both the motion to suppress (Docket No. 15) and the supplemental motion to suppress (Docket No. 25.)

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

---

[2] Adekunle also stands for the proposition that "the government, after detaining a suspected alimentary canal drug smuggler, must seek a judicial determination, within a reasonable period, that reasonable suspicion exists to support the detention." 2 F.3d at 562. In my view, this concern is not implicated here because Delmonaco's consent to the medical procedures was obtained before judicial intervention or oversight was called for.

                                                        /s/ Margaret J. Kravchuk
                                                        U.S. Magistrate Judge

Dated: August 31, 2005